No. 4155

Second Circuit

(Second Division)

———

CONTINENTAL SUPPLY CO. v. PALMER

———

(March 16, 1932. Opinion and Decree.)
(May 4, 1932. Rehearing Refused.)

———

Foster, Hall, Barrett & Smith, of Shreveport, attorneys for plaintiff, appellant.

Cook & Cook and C. D. Egan, of Shreveport, attorneys for defendant, appellee.

CULPEPPER, J. The defendant, J. F. Palmer, for a number of years was in the business of drilling wells. He owned three drilling rigs, but from 1928 to 1930 was not actively engaged in that line of business. He owned a farm some place in Texas, the operation of which took about half of his time. His home in Shreveport was at 4634 Fairfield avenue, where his family lived, and where he returned and lived whenever his business did not call him to other places.

During the year 1929, his drilling rigs were idle. His son, T. D. Palmer, obtained a contract to drill a well in Caddo parish for a man by the name of Lide. Defendant, because of a natural interest in his son's welfare, permitted the use of one of his rigs, free of rent, to drill this well. It was necessary from time to time, during the drilling, to replace missing or broken parts of the rig, and also to obtain other supplies.

T. D. Palmer had worked for his father for a number of years, most of the time doing actual manual work around a drilling rig, and had on a few occasions bought articles from the plaintiff in the name of his father. One purchase, in 1927, was for nearly $200 that was bought by, and delivered to, the son and charged to the father, and paid, with no order of any sort, not even by telephone, except that the defendant telephoned his son to buy these articles for a job he was on at the time.

The defendant had done some business with the plaintiff for a number of years and enjoyed a good credit. Oil well supplies were always delivered without question, charged to his account when requested, and the bills promptly settled.

Although the son, T. D. Palmer, had the contract for drilling this well, he applied to the plaintiff, he says, for a line of credit for the necessary supplies for the job in his own name. But plaintiff's Shreveport manager would not sell T. D. Palmer, he said, unless permitted to charge the same to his father, the defendant. This is denied, however, by T. D. Palmer, who gave a different version of the arrangements for credit.

At all events, T. D. Palmer, purchased, beginning August 14, 1929, and ending October 24, 1929, replacement parts to the rig and other supplies for the well to the amount of $705.77, which were charged to defendant and invoices mailed to the defendant at Shreveport from the St. Louis office within a few days of the purchase. Statements were also mailed out from time to time of subsequent purchases. These invoices and statements were apparently addressed sometimes to the defendant's residence, and sometimes to the defendant at 517 Ricou-Brewster building, where his son had an office.

The defendant was absent in Texas from March until June, 1929, when he returned to his home in Shreveport. He remained in Shreveport from June until the latter part of August, or first part of September, when he again returned to Texas, and stayed until Thanksgiving. His son during this period was also living at defendant's home.

While defendant was at home, probably in August, he saw two or three envelopes of the plaintiff company addressed to himself. He opened one of them, he says, and saw that it was a monthly statement, as he explained it, in the neighborhood of $150 or $200. It was then, he says, that he rang up the office of the plaintiff, in Shreveport, and told some one in the office, he didn't know who, not to charge

anything to him any more without a written order. After this he received two or three invoices, but did not speak to plaintiff about it, although he did to his son.

There was judgment for the defendant, and plaintiff has appealed.

The plaintiff undoubtedly was led to believe, and therefore assumed, under the circumstances, that whatever defendant's son purchased the defendant would be responsible for. The son was living in defendant's home, had worked for his father for a number of years, and had at least on one occasion made one substantial purchase in his father's name, which was paid without question, and for which no order had been given, either written or verbal.

Plaintiff denies that defendant ever called up any one in authority and repudiated the act of his son after he had definite information that the son was having the supplies charged to the defendant. It seems to us very unlikely that plaintiff would have continued to charge these supplies to the defendant after it had been forbidden to do so. And if the defendant had wanted to be certain that plaintiff had this information, and had wanted to prevent further embarrassment and save plaintiff further loss, there are numbers of ways in which he could have preserved an absolute record of any such notice that he might have given. In a matter of this importance, we think defendant owed the plaintiff the duty to make his disavowal of this conduct of his own son certain beyond all controversy. This he failed to do. A mere telephone conversation with some unknown person, even if it took place, is, we think, not sufficient.

Defendant filed in evidence two documents which he relies upon to corroborate the action he claims he took in this case after he found out what was going on.

One of these is a notation on an invoice for which he mailed a check to cover, directing the plaintiff not to charge anything to his account without a "written order." It is dated May 20, 1926. The other purports to be a letter to the same effect, dated April 25, 1928, addressed to plaintiff and signed by defendant, which he says he mailed by posting it in the mail box in the front porch of his home.

Plaintiff denies having received either of them. Letters and requests to this effect are frequently received by plaintiff, it appears, and, whenever they are received copies are immediately furnished to each employee, who is required to place his initials on the original as evidence of his knowledge of its existence. The employees are then to be governed accordingly.

Both of these documents have the earmarks of being manufactured evidence, and since no knowledge of the existence of either of them was brought home to any employee, in the usual or customary manner, and since the original of the letter could not be found in the files, we are led to the conclusion that they were, in fact, never sent. Besides, the notation on the invoice dated May 20, 1926, is alleged to have been made a year previous to the invoice of $193.46, purchased by the son admittedly without any kind of an order, verbal or written, except to the son, and which was paid by defendant without question.

We do not think defendant can be held liable for any of the articles that were charged to him before he had notice of such purchases. But defendant admits having received notice both in the form of invoices and a statement, while the account was still running, that his son was buying supplies from plaintiff, and having them charged to defendant, and, we think, he did not take sufficient means to stop it.

What had been theretofore an unauthor-

ized act of the son became ratified upon the defendant's failure to give the plaintiff notice of his disavowal of his son's acts, at least to the extent of rendering him liable for all goods purchased after knowledge of the son's conduct had been conveyed to him. Mangum v. Bell, 20 La. Ann. 215; Szymanski v. Plassan, 20 La. Ann. 90, 96 Am. Dec. 382; Civ. Code, art. 3010.

And it is immaterial whether they enured to defendant's benefit or not, although the filial interest that a father would naturally have for his son could be urged as an indirect benefit to say the least, but defendant's failure to make effective what he says now was a formal disavowal of the contract certainly induced plaintiff to continue to part with its merchandise, to its injury, and, since defendant could have effectively prevented this, he should be held liable for the merchandise delivered after notice had come to him that plaintiff was delivering goods to his son and charging them to defendant.

Defendant says that the statement which came to his home amounted to $150 or $200, and which had been sold and delivered without his knowledge up to that time, and for which he is not liable. We will give defendant the benefit of the larger figure, and put it at $200. We think he is liable for the balance of the account charged against him, and incurred by the son, subsequent to this notice, which amounts to $505.77.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that there now be judgment in favor of the plaintiff and against defendant in the sum of $505.77, with legal interest thereon from October 24, 1929, together with costs of both courts.